SUN MUT. INS. CO. *v.* BOARD OF LIQUIDATION OF THE CITY OF NEW ORLEANS.[1]

*(Circuit Court, E. D. Louisiana.　May 14, 1885.)*

1. LEGISLATIVE POWERS.

Where there are two classes of creditors with already existing debts, a legislative act could not, by transfer or appropriation of a debtor's property, give to one class a preference, to the exclusion of the other class, to such a degree as to give to one class an immediate and annual source of payment, and postpone to the other all payment for, possibly, a period of 40 years. See *Succession of Taylor,* 10 La. Ann. 510; *Milne* v. *Schmidt,* 12 La. Ann. 553. It is no more in the power of law makers than of debtors to effect an unequal distribution of the debtor's estate by making an application or transfer thereof among creditors already existing. *Atchafalaya Co.* v. *Bean,* 3 Rob. (La.) 415.

2. MUNICIPAL BONDS OF THE CITY OF NEW ORLEANS — ACTS OF LA. NO. 58 OF 1882, AND NO. 67 OF 1884, CONSTRUED.

Whatever provisions are contained in the act of 1882 subjecting any property or means of payment, which could be lawfully appropriated, to the payment of the extended bonds or coupon certificates, having been assented to on the part of the holders by accepting of the extension, is a contract which cannot be varied by any change or substitution, no matter how minute, and will continue in its operation upon whatever has been so appropriated till the obligations thereby secured shall have been fully paid. If the language in the act of 1882 did include the excess of the premium bond tax and the other property included in the grant under the act of 1884, while it would be valid as a contract between the complainants, the holders of the new obligations, and the city, it would be void so far as concerns the judgment creditors whose judgments are for debts existing antecedently to the passage of the act of 1882, under which the complainants claim, up to the point of the said judgment creditors being admitted to a proportionate or ratable share of such excess and other property.

In Chancery. On rule for an injunction.

*Henry J. Leovy, E. D. White,* and *Eugene D. Sanders,* for complainant.

*Henry C. Miller,* for defendant.

BILLINGS, J. This matter is submitted upon a bill of complaint, and affidavits and exhibits, on behalf of the complainants, and affidavits and documents on behalf of the respondents, upon an application for an injunction. The complainants are holders of "extended

[1] Reported by Joseph P. Horner, Esq., of the New Orleans bar.

bonds" and of "coupon certificates," under the act of 1882, and as such holders they seek to enjoin the respondents from issuing the bonds provided for under the act of 1884 to judgment creditors, upon the ground that the means provided for the payment of the latter are more or less identical with those set apart for the payment of the former. After a consideration of the arguments which were urged with such ability upon this question, it seems to me to be unnecessary to pass upon it. Without passing upon this question, even if the construction of the two acts be such as is contended for by complainants, there is, nevertheless, an impediment in the way of enforcing the grant of the act of 1882, so far as relates to the judgment creditors included in the provisions of the act of 1884. Both acts relate to the surplus arising under or out of the taxes levied in pursuance of the act creating the premium bond system and other property. Since this surplus is an annual result for a great number of years, wrought out by the fact that only a portion of the bonded creditors became participants in the scheme, it is in its nature and capacity to be disposed of either by the legislature or by the debtor, subject to the same legal limitations and rules as any other property. Until the legislature had given to a creditor a grant or legislative permission to share in this property, it might have been impossible for him to present the question of his right to a share in this residue of a tax; but by the act of 1884 judgment creditors have been placed in such a situation that they can lawfully present the question of their right to a participation in this residue to the extent which this act recognizes their right.

It is to be observed that the act of 1884, under which the judgment creditors claim, includes only such judgments as had been or should be obtained against the city of New Orleans for debts which had an existence prior to the year 1879. It relates, therefore, only to debts owed antecedently to its passage, and has no reference to debts thereafter arising. The debts represented by the extended bonds and the coupon certificates which form the basis of the claim of the complainants were also pre-existing, having been owed by the city for many years. The debts on both sides of this controversy, therefore, were debts in existence antecedently to the passage of the act of 1882.

The article No. 3,150 (old) of the Civil Code had been in force as a part of the law of the state since the year 1825. That article is as follows: "The property of the debtor is the common pledge of his creditors." So far as the legislature allows municipal corporations to become debtors they are, equally with individuals, within the dominion of this law. Since the power of taxation is vested in the legislature so far as concerns the fresh levy of taxes, this rule, however binding in equity and upon the conscience of the legislators, could not be enforced. So far, also, as future debts are concerned, the legislature could to any extent exclude their holders from participation in the property of a debtor. But so far as pre-existing debts are con-

cerned, and so far as relates to any revenue which, though springing from a tax, had come to have the qualities of property,—*i. e.*, so far as relates to this surplus, and the other property about which this contention is made,—the legislature had no power to make any transfers or assignment which should not be ratable among all the creditors similarly situated as to the absence of liens. This provision of the statute guarantying to all the creditors this impartial distribution had entered into all these transactions on both sides, both as a limit and a guaranty, and had the force and effect of a paramount law, and restricted the old bondholders from taking, merely by virtue of the act authorizing the issue of these new obligations, any portion of the property of the debtor, which would leave any class of creditors then existing without a proportionate provision or means of payment out of the debtor's property.

Did the act of 1882, if construed as it is contended for by the complainant, do this? Using words in a general sense, the debtor had no property upon which a writ of *fieri facias* could operate. The act of 1876 had, so far as the matter was capable of legislative restriction, limited the authority of the city to levy taxes to 15 mills on the dollar. Five mills of this had been devoted to the premium bonds. By the act of 1882 five mills, if necessary, had been devoted to these extended bonds and coupon certificates. The alimony of the city, using that word to include only the expenses absolutely necessary to enable the city government to discharge its purely public functions or duties, has been abundantly established to consume at the very least five mills.

The judgment creditors had been deprived by article 1 of the miscellaneous ordinances, subdivision 3, of the constitution of 1879, of all opportunity of using their judgments in the payment of taxes. The hollow and delusive provisions of the act of 1870, No. 5, had been judicially declared to be satisfied by the annual devotion on the part of the city of an amount merely nominal for the payment of hundreds of thousands of dollars of judgments. Unless, then, the judgment creditors could participate in that portion of the five-mill premium bond tax which remained after all who had any right thereto had been paid, they were left with a debtor who had been stripped of every means of paying any portion of these judgments. If, then, it was the intention of the legislature, as is contended by the complainants, by the act of 1882 to transfer to the extended bond and coupon certificate holders all of this surplus, and that intention should have operation, it would result that where there were two classes of creditors, with already existing debts, the legislative act could, by a transfer or appropriation of a debtor's property, give to one class a preference to the exclusion of the other class, to such a degree as to give to one class an immediate and annual source of payment, and postpone to the other all payment for possibly a period of 40 years. I think the judicial decisions of all courts, and especially of our own, have

declared such a preference prohibited.　For the doctrine of the statute compelling equal distribution or provision among or for co-existing creditors, *i. e.*, to prevent any partial appropriation by the debtor, see *Succession of Taylor*, 10 La. Ann. 510, and an affirmation of the law of that case in *Milne* v. *Schmidt*, 12 La. Ann. 553.　This statutory rule operates upon the legislature as well as upon the debtor. It is no more in the power of law-makers than of debtors to effect an unequal distribution of the debtor's estate by making an application or transfer thereof among creditors already existing.　This also has been judicially declared.　In *Atchafalaya R. & Banking Co.* v. *Bean*, 3 Rob. 415, the court says:

"I think it clear that the legislature cannot constitutionally, by act subsequent to the creation of a debt, interfere to change or disturb the relation between debtor and creditor, or the relative rank of creditors *inter se*, and that two creditors who stood equal originally in the eyes of the law, and had an equal privilege to be paid, neither having any special lien or privilege over the other, must remain forever equal, notwithstanding any act of the legislature sanctioning a different doctrine."

Unless, then, the old bondholders have some privilege upon the excess, it could not be *in toto* given by the act of 1882 to the exclusion of already existing judgment creditors.　But the old bondholders had no privilege upon this excess.　By the acts under which the different series of bonds were authorized, a right to a tax was given, which remains in all its original force, except as waived by the holder's own volition.　But this is altogether distinct from any premium bond excess, and if it was to be considered at all, would be an obstacle rather than aid to the complainants; for it would present the case of a complainant with a perfect security asking to have a preference in his favor maintained as against another creditor who had no security whatever.　Until the old bondholders assented to the premium bond plan, by an exchange of his bond, he could claim nothing under it. Till such acceptance the premium bond act stood as an unaccepted and therefore inoperative offer.　The provision that the drawn premium bonds should be applied to the purchase of the old bonds, until in some way assented to by the holders, was, so far as relates to such holders, a mere legislative provision, having no quality of a contract. In fact, the act of 1880 had altogether recalled this provision.

It was urged, *arguendo*, that section 10 of the act of 1882 guarantied the continuous application of the drawn premium bonds to the purchase of the old bonds, according to sections 11 or 5 of the premium bond act.　But the carefully selected words of that section of the act of 1882 exclude such an interpretation, and merely declare the whole act a contract, which may be enforced by "every judicial process then in force, or in force at the time of the creation of the debt;" *i. e.*, the rights to be enforced were those created by the act of 1882.　The process for their enforcement should be that in force in 1882, as well as that in force at the time of the issuing of the

bonds. This section defines and secures the means of enforcing the rights of the holders of the new securities, but does not enlarge those rights. The act of 1882 correctly assumes that its own force alone was to operate to transfer this surplus, and if it was not in the power of the legislature at that time to exclude the judgment creditors from an equal participation in it, then the complainants have failed to establish their case.

The conclusions which followed from the facts and the law of the case are:

1. That whatever provisions are contained in the act of 1882 subjecting any property or means of payment, which would be lawfully appropriated, to the payment of the extended bonds or coupon certificates, having been assented to on the part of the holders by accepting of the extension, is a contract which cannot be varied by any change or substitution, no matter how minute, and will continue in its operation upon whatever has been so appropriated till the obligations thereby secured shall have been fully paid.

2. If the language in the act of 1882 did include the excess of the premium bond tax and the other property included in the grant under the act of 1884, while it would be valid as a contract between the complainants, the holders of the new obligations, and the city, it would be void so far as concerns the judgment creditors whose judgments are for debts existing antecedently to the passage of the act of 1882, under which the complainants claim, up to the point of the said judgment creditors being admitted to a proportionate or ratable share of such excess and other property.

3. It follows, therefore, that the act of 1884 authorizes the issuance of bonds only to creditors who have obtained judgments for debts existing antecedently to the time of the passage of the act of 1882. The injunction must be refused.

---

### APPENDIX.

| | | |
|---|---:|---:|
| Amount of coupons funded into coupon certificates due within 10 years, under section 4 of act of 1882, - - | $1,913,617 | 50 |
| Amount of bonds extended 40 years under section 3, - | 2,695,600 | 00 |

Both coupon certificates and extended bonds are payable at any time, at option of the city.

| | | |
|---|---:|---:|
| Six per cent. on coupon certificates, - - - - | $114,817 | 00 |
| Six per cent. on extended bonds, - - - | 161,736 | 00 |
| Total interest, - - - - - | $276,553 | 00 |
| Value of property subject to taxation in New Orleans, - | $115,000,000 | 00 |
| Five mills upon each dollar gives - - - | 575,000 | 00 |
| Deduct ordinary shrinkage, 20 per cent., leaves 80 per cent., | 460,000 | 00 |
| Deduct amount necessary to pay total of first year's interest, - - - - - - - | 276,553 | 00 |
| Leaves to be applied to bonds and certificates, - - - | 183,447 | 00 |
| Say in round numbers, - - - - - | 180,000 | 00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| So that amount reduced in 1885 would be | - | - | | $180,000 00 |
| In 1886, | - | - | - | - | - | - | 190,000 00 |
| In 1887, | - | - | - | - | - | - | 202,000 00 |
| In 1888, | - | - | - | - | - | - | 227,263 00 |
| In 1889, | - | - | - | - | - | - | 240,898 00 |
| In 1890, | - | - | - | - | - | - | 255,351 00 |
| In 1891, | - | - | - | - | - | - | 270,672 00 |
| In 1892, | - | - | - | - | - | - | 286,914 00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total, | - | - | - | - | - | - | $2,068,818 00 |

So that prior to January 1, 1893, which is the day of the maturity of the coupon certificates, they would be paid and wholly withdrawn. There would be left thereafter the entire net proceeds of the five-mill tax, *i. e.*, $460,000, to be applied annually, in the first place to the payment of the interest of the extended bonds, and secondly to the payment of the extended bonds.

| | | | | |
|---|---|---|---|---|
| Net amount of tax, deducting 20 per cent. for shrinkage, | - | $460,000 |
| In 1893—First year's interest on extended bonds, | - | - | 161,736 |

| | | | | |
|---|---|---|---|---|
| Balance for payment of extended bonds, | - | $298,264 |
| In 1894, | - | - | - | - | - | - | - | - | 316,259 |
| In 1895, | - | - | - | - | - | - | - | 335,133 |
| In 1896, | - | - | - | - | - | - | - | 355,243 |
| In 1897, | - | - | - | - | - | - | - | 376,558 |
| In 1898, | - | - | - | - | - | - | - | 399,151 |
| In 1899, | - | - | - | - | - | - | - | 427,100 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total, | - | - | - | - | - | - | $1,507,710 |

So that prior to January 1, 1899, just 23 years before the extended bonds are compulsorily due, both the extended bonds and the coupon certificates would be wholly paid and withdrawn.

---

(*Extracts from Act No.* 58 *of the Legislature of Louisiana of* 1882, *Above Referred to.*)

Section 1. Be it enacted by the general assembly of the state of Louisiana, that the city of New Orleans, acting through the board of liquidation of the city debt, or other duly-authorized officers, be, and she is hereby, authorized and empowered to extend the bonded indebtedness of said city, other than premium bonds outstanding at the passage and promulgation of this act, for the period of forty years, from January 1, 1883, at a rate of interest not exceeding six per cent., provided the city shall have the right to call in said bonds, so renewed or extended, for payment at par after the year 1895, upon giving notice to that effect during a period of three months.

Sec. 2. Be it further enacted, etc., that the provisions of the foregoing section be, and they are hereby, extended to all bonded obligations of the city, except premium bonds, whether due or to become due, including such as may have been merged into judgments, but for which no tax, special or otherwise, has yet been levied: provided, nothing in this act shall be considered as a waiver of prescription which may have accrued or may accrue on such bonds in favor of the city.

\*    \*    \*    \*    \*    \*    \*    \*    \*

Sec. 6. Be it further enacted, etc., that all funds now, or that may be at the time of the passage of this act, in the hands of the board of liquidation of the city debt, under existing laws, shall be deposited with the fiscal agent of

the board, to the credit of the account known as the city debt fund, which fund shall be applied exclusively to the purchase, on the most favorable terms, not exceeding par, of face value of any of the outstanding bonds or coupons, and the certificates therefor, of said city, which are extended to be retired under the provision of this act: provided that said city debt fund shall be used first to provide for and pay the interest on the bonds and certificates contemplated herein. And it shall be the duty of the council, in its annual budget, to make an appropriation to carry out the provisions of this act.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Sec. 10. Be it further enacted, etc., that this act, in all its parts, provisions, terms, conditions, obligations, and limitations, is to be deemed and to constitute a valid, binding contract between the state of Louisiana, the city of New Orleans, its residents, citizens, and tax-payers, and the holders of the bonds herein authorized to be extended, and the judicial process of the state of Louisiana, now authorized by law, or in force at the creation of said bonded debt as aforesaid, may be resorted to, and is to be recognized and applied to the judges thereof, for the enforcement of its provisions in favor of any party having and showing just cause for complaint or injury, or a violation of any of the provisions thereof.

*(Extract from Act No. 67 of the Legislature of Louisiana of 1884, Above Referred to.)*

Section 1. Be it enacted by the general assembly of the state of Louisiana, that section 2 of act No. 133, approved April 10, 1880, be amended and re-enacted so as to read: That the commissioners of the consolidated debt, or the city officers, provided and named in section 1 of this act, and the syndicate hereby created, shall constitute a board of liquidation of the city debt, and the said board shall have exclusive control and direction of all matters relating to the judgment and bonded debt of the city of New Orleans. The board of liquidation shall cause to be prepared bonds of the city of New Orleans, which bonds shall only be used for the purpose of negotiation or exchange, as hereinafter provided. The said bonds shall be signed by the mayor and treasurer of the city of New Orleans, and countersigned by the comptroller of said city; they shall be dated June 1, 1884, and be made payable in fifty years from said date, or sooner at the option of the city, and bear interest at the rate of five per cent. per annum from the date of said bonds, payable semi-annually on the first days of June and December of each year; said interest to be represented by one hundred coupons annexed to each bond. The said bonds and interest coupons annexed may be issued for such sums as may be deemed most convenient by the board of liquidation, and be made payable at such place or places as may be designated in the bond; but the said bonds shall be made payable, interest and principal, in lawful money of the United States.

Sec. 2. Be it further enacted, etc., that section 3 of act No. 133, approved April 10, 1880, be amended and re-enacted so as to read: That the said board of liquidation of the city debt be, and it is hereby, authorized and required, and it is made the duty of the said board, to retire and cancel the entire debt of the city of New Orleans now in the form of executory judgments and registered under the provisions of act No. 5 of 1870, and that which hereafter may become merged into executory judgments and likewise registered, except the floating debt or claims created for and against the year 1879 and subsequent years; that it is the full intent and meaning of this act to apply solely the privileges thereof to executory judgments at present rendered against such city, and to such floating debt or claims against said city for 1878, and previous years, merged and to be merged into executory judgments, whether

absolute or rendered against the revenues of any particular year or years previous to the year 1879; that, for the purpose of retiring and canceling said judgment debt, the said board is authorized and required either to sell the bonds to be issued under this act, at not less than their par value, and apply the proceeds thereof to the payment of the said judgments, as above specified, or issue said bonds in exchange for said judgments.

Sec. 3. Be it further enacted, etc., that section five of act No. 133, approved April 10, 1880, be amended and re-enacted so as to read: That it shall be the duty of the city of New Orleans to turn over and transfer to the board of liquidation, immediately after the passage of this act, all property of the city of New Orleans, real and personal, not dedicated to public use: provided, that in the sale of batture property, which is herein included, the right of the city to all future accretions shall be reserved; all assets of said city realized, and to be realized, except such assets and revenues as pertain to the administration of said city, and necessary for the support of the same as at present authorized; all uncollected revenues of said city anterior to the year 1879, when collected; and the said board is hereby authorized and required to dispose of said property and assets, other than stock held in corporations, on such terms and conditions as said board may deem to be to the best interests of the city, and apply the proceeds thereof, together with the uncollected revenues above mentioned, when the same are collected—*First*, to the payment of the interest on the bonds authorized herein, in the event that the tax authorized by section eleven of said act No. 133, approved April 10, 1880, be not levied; *second*, to the redemption and cancellation of the said bonds: provided, that bids for the sale of the same shall be by sealed proposals, and that preference shall be given to the lowest bidder: and provided further, that no bids above the par value of said bonds shall be accepted.